# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# WACO DIVISION

| | |
|---|---|
| MEDIAPOINTE, INC., <br><br> Plaintiff, <br><br> v. <br><br> AKAMAI TECHNOLOGIES, INC., <br><br> Defendant. | Case No. 6:21-CV-852 <br><br> COMPLAINT FOR PATENT INFRINGEMENT <br><br><br> DEMAND FOR JURY TRIAL |

## COMPLAINT FOR PATENT INFRINGEMENT

This is an action for patent infringement in which Plaintiff MediaPointe, Inc. ("MediaPointe"), makes the following allegations against Defendant Akamai Technologies, Inc. ("Akamai"):

### BACKGROUND

1. This Complaint asserts causes of action for infringement of the following United States patents owned by MediaPointe: United States Patent Nos. 8,559,426 ("'426 Patent") and 9,426,195 ("'195 Patent") (collectively, the "Asserted Patents").

### THE PARTIES

2. Plaintiff MediaPointe is a corporation organized and existing under the laws of California, with a principal place of business at 3952 Camino Ranchero, Camarillo, California 93012.

3. Defendant Akamai is a Delaware Corporation with a principal office at 150 Broadway, Cambridge, Massachusetts 02142. Akamai offers its products and/or services, including those accused herein of infringement, to customers and potential customers located in

1

Texas and in the Western District of Texas. Akamai may be served through its registered agent, The Corporation Service Company, 211 East 7th Street, Suite 620, Austin, Texas 78701.

**JURISDICTION AND VENUE**

4. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the patent laws of the United States, 35 U.S.C. §§ 1 *et seq.*

5. This Court has personal jurisdiction over Akamai because, *inter alia*, Akamai has minimum contacts with Texas and this district such that this venue is a fair and reasonable one. Akamai has committed acts within the Western District of Texas giving rise to this action and has established minimum contacts with this forum such that the exercise of jurisdiction over Akamai would not offend traditional notions of fair play and substantial justice. Akamai has committed and continues to commit acts of infringement in this District by, among other things, regularly doing or soliciting business, recruiting Texas residents for employment, and offering to sell and selling products and/or services that infringe the Asserted Patents.

6. Akamai is a multinational technology company that collects, stores, organizes, and distributes data. Akamai has a substantial presence in the District through the products and services it provides residents of this District, including delivering digital content.

7. Akamai's content delivery network ("CDN") is one example of its physical presence in this District. Using its CDN—a "large, geographically distributed network of specialized servers that accelerate the delivery of web content and rich media to internet-connected devices" —Akamai provides web-based services, including audio and/or video streaming, to users throughout the world, including in this District.

8. Akamai claims that its Intelligent Edge Platform is the world's largest globally distributed platform. Akamai employs a distributed architecture to effectively deliver content to viewers through, *inter alia*, its "Adaptive Media Delivery" product, while trying to avoid "latency,

congestion, and packet loss, which can significantly limit online video quality."[1] Proximity to users aids Akamai to "effectively bypass [those] common interruptions."[2] To that end, Akamai "caches content close to end users," using, *inter alia*, servers hosted by local internet service providers ("ISPs") to deliver content to users. Akamai claims its "distributed architecture and ISP partnerships place the servers — and [its customers'] content — closer to the viewer, for better reliability, availability, and performance."

9. To achieve these goals, Akamai has in place "more than 233,000 servers in over 130 countries and within more than 1,600 networks around the world."[3]

10. Through the Akamai Accelerated Network Partner ("AANP") program, Akamai partners with ISPs and other network providers, who "agree to colocate Akamai servers within their own networks," in order to place those servers "as close to the end users as possible."[4] One or more of the partners are located in this District, including Rackspace Technology,[5] which has a datacenter located at 1 Fanatical Place, Windcrest, Texas 78218.[6] Akamai's servers located in this District deliver cached content to residents in this District. Accordingly, those physical servers comprise Akamai's regular and established places of business.

---

[1] https://www.akamai.com/us/en/multimedia/documents/product-brief/adaptive-media-delivery-product-brief.pdf (last accessed August 16, 2021).
[2] https://www.akamai.com/us/en/resources/visualizing-akamai/media-delivery-map.jsp (last accessed August 16, 2021).
[3] *https://blogs.akamai.com/2017/09/cybersecurity-executive-order-13800-more-than-a-risk-assessment.html* (last accessed August 16, 2021).
[4] https://www.akamai.com/us/en/multimedia/documents/akamai/akamai-accelerated-network-partner-aanp-faq.pdf (last accessed August 16, 2021).
[5] https://www.akamai.com/us/en/partners/akamai-partners.jsp?country=usa (last accessed August 16, 2021).
[6] https://cloudandcolocation.com/datacenters/rackspace-san-antonio-data-center/ (last accessed August 16, 2021).

11.     On information and belief, when a provider agrees to host an Akamai server, Akamai retains ownership and exclusive control of the server, which it provides to the provider "at no cost."[7] The servers continue to be "managed by Akamai." On information and belief, through its contract with providers, Akamai retains exclusive control of the provider-hosted servers, including but not limited to requiring the providers to meet Akamai's network requirements; shipping, configuring, monitoring, and updating the Akamai servers; and limiting the activities that the provider may take that have the potential to impact the hosted Akamai servers.

12.     Because Akamai uses its local servers to provide content to residents of this District, Akamai's infringement of MediaPointe's patents—which, as described below, relate to intelligent data networks—is substantially related to its regular and established place(s) of business in this District. Many of the claims discussed herein relate to Akamai's server architecture generally and its localized, hosted servers specifically.

13.     On information and believe, Akamai also currently or previously maintained an office in this judicial District, at 6836 Austin Center Blvd 165, Austin, Texas 78731.

14.     In an action filed by Content Delivery Solutions against Akamai in this District, Akamai has not contested that this federal judicial district is a proper venue for patent infringement actions against it. *See Content Delivery Solutions LLC v. Akamai Techs., Inc.*, No: 1:11-cv-00216-LY, Dkt. No. 78.

15.     Venue in the Western District of Texas is proper under 28 U.S.C. §§ 1391(b) and (c) and 1400(b).

---

[7] https://www.akamai.com/us/en/multimedia/documents/akamai/akamai-accelerated-network-partner-aanp-faq.pdf (last accessed August 16, 2021).

16. Upon information and belief, Akamai has committed infringing acts in this District by making, using, offering for sale, selling, or importing products or services that infringe the Asserted Patents (as defined herein), or by inducing others to infringe the Asserted Patents.

**DEFENDANT'S ACCUSED PRODUCTS**

17. The Internet and applicable technologies such as Transfer Control Protocol/Internet Protocol (TCP/IP) were originally designed according to the end-to-end principle, whereby the core network is specialized, simplified, and optimized to only forward data packets between a host and an end client. As the Internet became more popular, issues began to arise. For example, a single server in Massachusetts state would have to serve customers that are distributed nationally and internationally. The data being transmitted passes through various asynchronous transmission devices, such as routers, switches, hubs, and bridges, with each device adding to the latency of the transmitted data packets. The Internet was originally designed to carry text-based documents such as email. Performance of the Internet using email is not critically time dependent, thus the intrinsic latency of the Internet infrastructure is acceptable, and the utilization of bandwidth is minimal. However, an increase in data volume and demand results in performance problems for real-time applications where network timing and sustained data rates are critical. Such applications can include streaming media (including, for example, audio, video, and metadata), web-conferencing, and Internet telephony. In prior art data distribution networks, the distribution of data is seriously restricted due to lack of bandwidth, which leads to bottlenecks during transmission from a content server to an Internet Service Provider, and ultimately to the end users. Bottlenecks reduce viewing quality and access speeds, and increase viewing costs as ISPs pass on bandwidth costs to end users. Furthermore, when data packets are lost, the end user's request for retransmission of that data must be sent back to the content server, and this retransmission introduces redundant bandwidth utilization, affecting all users connected to that content server. Because bandwidth constraints are

defined by the lowest capacity hop between the content source and the end user, capacity additions to one Internet segment does not necessarily improve end-to-end capacity.

18. Content Delivery Networks (CDN) came into existence as a means to alleviate bottlenecks on the Internet through the use of delivery nodes in multiple locations. A CDN is a globally distributed network of servers that can deliver content to consumers. CDNs store cached content on an edge server's point of presence (POP) locations that are close to consuming users, thereby minimizing network latency. For example, one could place nodes in Austin, Texas that would more efficiently serve customers located close to the Austin area. Other nodes can be distributed nationally and internationally such that users access data from nodes located closer to them.

19. Upon information and belief, and based on products identified on Akamai's websites, Akamai makes, uses, offers to sell, and/or sells in the United States, and/or imports into the United States, products made in accordance with or otherwise practicing the Asserted Patents. These products include, but are not limited to, Akamai's Content Delivery Network, Adaptive Media Delivery, Akamai Intelligent Edge Platform, Aura Managed CDN, Licensed CDN, Video On Demand, and Adaptive Media Player product and service offerings (collectively, "Accused Akamai Products and Services").

20. Upon information and belief, Akamai actively and knowingly directs, causes, induces, and encourages others, including, but not limited to, its designers, manufacturers, suppliers, distributors, resellers, audio and video integrators and consultants, software developers, customers, and/or end users, to make, use, sell, and/or offer to sell in the United States, and/or import into the United States, products made in accordance with the Asserted Patents, including, but not limited to, the Accused Akamai Products and Services, by, among other things, providing

instructions, manuals, and technical assistance relating to the installation, setup, use, operation, and maintenance of said Accused Akamai Products and Services.

21. Akamai employs a distributed architecture to effectively deliver content to users through, *inter alia*, its "Adaptive Media Delivery" product, while trying to avoid "latency, congestion, and packet loss, which can significantly limit online video quality."[8] Proximity to users allows Akamai to "effectively bypass [those] common interruptions." To that end, Akamai "caches content close to end users," using servers hosted by local ISPs to deliver content to users. Akamai claims its "distributed architecture and ISP partnerships place the servers—and [its customers'] content—closer to the view, for better reliability, availability, and performance."

22. Akamai operates and sells access to the Accused Akamai Products and Services to provide load balancing, routing, caching, and other services to customers via servers located in this district and throughout the United States (the "Akamai Servers"). The Akamai Servers incorporate technology that uses nodes that relay a continuous stream of data from a content provider, replicate the continuous stream of data, and transmit the replicated stream of data to at least one other client, pursuant to the inventions disclosed in the Asserted Patents.

23. Akamai describes Adaptive Media Delivery as being "optimized for streaming" to provide a consistent viewing experience across a broad variety of network types.[9] In typical usage, "a content provider uploads an on-demand clip into an Akamai content storage facility. [Akamai] distribute[s] the storage facility over many data centers and automatically replicate the uploaded clip to a subset of the centers. An edge server that receives a stream request downloads the content

---

[8] https://www.akamai.com/us/en/multimedia/documents/product-brief/adaptive-media-delivery-product-brief.pdf (last accessed August 16, 2021).
[9] *Id.*

7

from its optimal storage location and caches it locally while serving the request."[10] Akamai provides the following diagram illustrating the operations of Adaptive Media Delivery:[11]



24. Akamai describes Global Traffic Management as being a "distributed, fault-tolerant system that makes intelligent routing decisions based on real-time data center performance and global Internet conditions. It manages traffic to your data centers by choosing the best answers, from moment to moment, to return to client name servers in response to their queries about Global Traffic Management domains."[12] One of the possible settings is geographic mapping, which "lets you configure a property that returns a CNAME based on the geographic location of the request. You can reuse maps for multiple properties or create new ones. The minimum number of map

---

[10] https://www.akamai.com/us/en/multimedia/documents/technical-publication/globally-distributed-content-delivery.pdf (last accessed August 16, 2021).

[11] https://learn.akamai.com/en-us/webhelp/adaptive-media-delivery/adaptive-media-delivery-implementation-guide/GUID-C9DE78F4-4615-4F72-9C99-3661A5ADDC37.html (last accessed August 16, 2021).

[12] https://learn.akamai.com/en-us/webhelp/global-traffic-management/global-traffic-management-user-guide/GUID-05D70D31-6F3E-4766-ACD9-FA71A964A17A.html (last accessed August 16, 2021).

definitions is two so that: at least one maps one or more countries to a data center; [and] one routes all other traffic."[13]

25. Akamai uses various "cloudlets" that enable its customers to use various features to improve user experience. One of the cloudlets is the "Visitor Prioritization" cloudlet that "acts as a front-end shock absorber when peak traffic increases demand for those transactions that require the origin for processing, like shopping cart check-outs, donation pages, service/application subscriptions, and form registration."[14] Akamai provides the following diagram illustrating the workflow of the Visitor Prioritization cloudlet:[15]



**THE ASSERTED PATENTS**

26. The Asserted Patents teach a solution to a problem inherent to computer technology: how to improve latency and load balancing in content delivery networks.

---

[13] https://learn.akamai.com/en-us/webhelp/global-traffic-management/global-traffic-management-user-guide/GUID-65EB07B3-1BE3-40DB-8682-50E6836A8A78.html (last accessed August 16, 2021).

[14] https://learn.akamai.com/en-us/webhelp/visitor-prioritization/visitor-prioritization-guide/GUID-0A047B32-BCA0-411C-8592-4D92D92A6D53.html (last accessed August 16, 2021).

[15] https://learn.akamai.com/en-us/webhelp/visitor-prioritization/visitor-prioritization-guide/GUID-72509DED-5803-408D-A887-902910DCB03E.html (last accessed August 16, 2021).

By providing novel and inventive systems and methods for relaying data from a content provider to clients, the focus of the patented claims is on an improvement to network functionality itself.

27. By way of a non-limiting example and as the Asserted Patents describe, one issue with aforementioned prior art transmission schemes is that they do not provide for the most time- or cost-effective routing of content to end users. In other words, the data travels through more devices (and thus more hops) than would otherwise be optimal. This not only leads to a reduction in viewing quality and access speed, but also reduces the ability of content providers to track and manage the distribution of proprietary content. The most common method that ISPs employ to manage bandwidth constraints and inefficient routing is to deploy dedicated streaming media servers (SMS) to store and redistribute content to ISP customers, regionally. There are a number of problems with this approach. Typically, an ISP can manage the aggregated bandwidth requirement of a plurality of clients streaming a plurality of data packets within the local area network (LAN) if the data is from a server located within the ISP LAN. The cost to maintain and manage such servers is high. Additionally, content providers are often reluctant to provide copyrighted content to autonomous operators where liability for royalties or licensing fees could exist. A further disadvantage of having an autonomous local server is that the storage capacity of the server often limits the availability of content, forcing ISP clients to access streamed media through the wide area network (WAN).

28. The Asserted Patents attempt to overcome such problems with data transmissions over the Internet by providing an intelligent distribution network (IDN) which optimizes delivery of content to large and diversely located clients by minimizing the impact of network irregularities, minimizing bandwidth usage as compared to data delivery from a single content source to multiple simultaneous viewers, minimizing packet loss resulting in decreased latency in data stream

delivery, and maximizing sustained data rates to clients. The claimed invention achieves this through the configuration of two main components, at least one IDN node and at least one IDN management center. When a client requests data from anywhere on the Internet, the client is directed to an IDN management center which, in turn, refers the client to its best performing or optimal IDN node. The best performing IDN nodes and links are identified by a mapping engine which maps trace routes between the IDN management center, the IDN nodes, the various transmission devices, and the client, to determine the optimal routing with which to deliver the content. The IDN then relays the data to the client through the optimal IDN node and route.

29. In addition, the Asserted Patents provide that the IDN node may be configured to replicate a stream of data from the content provider in response to subsequent requests for the same content. Thereafter, the replicated stream of data may be efficiently transmitted to additional clients in response to subsequent requests.

## COUNT ONE
## Infringement of the '426 Patent

30. Plaintiff repeats and incorporates by reference each preceding paragraph as if fully set forth herein and further states:

31. On October 15, 2013, the United States Patent and Trademark Office duly and legally issued the '426 Patent entitled "System and Method For Distribution of Data Packets Utilizing An Intelligent Distribution Network." A true and correct copy of the '426 Patent is attached as Exhibit A to this Complaint.

32. MediaPointe owns all rights, title, and interest in and to the '426 Patent, including the right to assert all causes of action under the '426 Patent and the right to any remedies for the infringement of the '426 Patent.

33. The '426 Patent generally relates to technology that efficiently distributes streamed media content to diversely located client locations via an intelligent distribution network (IDN). The claims of the '426 Patent, including claim 1, recite novel and inventive systems and methods for the distribution of data.

34. For example, claim 1 of the '426 Patent recites:

> 1. A system comprising:
>
> a management center;
>
> a plurality of nodes configured to: relay a continuous stream of data from a content provider to a first client in response to an initial request for the continuous stream of data, replicate the continuous stream of data, and transmit the replicated stream of data to at least one other client;
>
> wherein the management center comprises a mapping engine that is configured to map trace routes between the management center, at least one of the nodes, and at least the first client so as to determine one or more optimal routes from the management center to the first client via the at least one of the nodes, and configured to direct a node relaying the continuous stream of data from the content provider to the first client to replicate the continuous stream of data from the content provider, in response to subsequent requests for the continuous stream of data, while the node is relaying the continuous stream of data from the content provider to the first client, and transmit the replicated stream of data to the at least one other client in response to the subsequent requests for the continuous stream of data; and
>
> wherein the management center is configured to downgrade lower priority clients from a higher quality of service network link to a less optimal network link when a higher priority client requests use of the higher quality of service network link.

35. Akamai has directly infringed and continues to directly infringe, literally and/or under the doctrine of equivalents, one or more claims, including at least claim 1, of the '426 Patent in violation of 35 U.S.C. § 271(a). For example, Akamai has, without authorization, operated, used, and sold, and continues to operate, use, and sell, access to its CDN that includes the Akamai Servers ("'426 Accused Instrumentalities"), which are capable of operating in the manner

described in the claims of the '426 Patent, thereby infringing at least claim 1 of the '426 Patent. Akamai's infringing use of the '426 Accused Instrumentalities includes its internal use and testing of the '426 Accused Instrumentalities.

36. The '426 Accused Instrumentalities satisfy all claim limitations of one or more of the claims of the '426 Patent, including at least claim 1.

37. By way of a non-limiting example, the '426 Accused Instrumentalities include a system that includes a management center. The '426 Accused Instrumentalities further include a plurality of nodes (Akamai's more than 233,000 servers) that are configured to relay a continuous stream of data and transmit the replicated stream of data to at least one other client.

38. Further, the management center of the '426 Accused Instrumentalities comprises a mapping engine that is capable of or configured to map trace routes between the management center, at least one of the nodes, and at least the first client, to determine the optimal routing with which to deliver the content and relay the data to the client through the optimal IDN node and route. The '426 Accused Instrumentalities includes the ability of the user to choose amongst four available routing methods. These include methods based solely on latency times as well as user configurable methods.

39. Further, the management center of the '426 Accused Instrumentalities has the capability of and/or is configured to downgrade lower priority clients from a higher quality of service network link to a less optimal network link. The Visitor Prioritization cloudlet sends high-priority users to their intended destination, while lower-priority users are sent to a less optimal link in the form of a custom waiting room. The criteria for determining if a user is low-priority or high-priority can be changed dynamically.

40. Since having notice of the '426 Patent, Akamai has indirectly infringed and continues to indirectly infringe the '426 Patent in violation of 35 U.S.C. § 271(b) by taking active steps to encourage and facilitate direct infringement by others, including OEMs, agent-subsidiaries, affiliates, partners, service providers, manufacturers, importers, resellers, customers, and/or end users, in this district and elsewhere in the United States, through the dissemination and maintenance of the Accused Instrumentalities and the creation and dissemination of promotional and marketing materials, supporting materials, instructions, product manuals, and/or technical information relating to such products with knowledge and the specific intent that its efforts will result in the direct infringement of the '426 Patent.

41. For example, Akamai took active steps to encourage end users to utilize its CDN network in the United States in a manner it knows will directly infringe each element of at least claim 1 of the '426 Patent, including by selling access to its CDN and encouraging users to operate devices on that network, despite knowing of the '426 Patent and the fact that such usage of Akamai's CDN will infringe the '426 Patent. The infringing aspects of the '426 Accused Instrumentalities otherwise have no meaningful use, let alone any meaningful non-infringing use.

42. Such active steps include, for example, advertising and marketing Akamai's CDN services, marketing and selling of devices capable of or intended for use on Akamai's CDN, publishing manuals and promotional literature describing and instructing users to utilize Akamai's CDN, and offering support and technical assistance to its customers that encourage use of Akamai's CDN in ways that directly infringe at least claim 1 of the '426 Patent.

43. Akamai undertook and continues to undertake the above-identified active steps after receiving notice of the '426 Patent and how those steps induce infringement of the '426 Patent.

44. Akamai's acts of infringement have caused and continue to cause damage to MediaPointe, and MediaPointe is entitled to recover from Akamai the damages it has sustained as a result of those wrongful acts in an amount subject to proof at trial, but in no event less than a reasonable royalty for the use made of the invention in the '426 Patent, together with interest and costs as fixed by the Court. Akamai's infringement of MediaPointe's rights under the '426 Patent will continue to damage MediaPointe, causing irreparable harm for which there is no adequate remedy at law, unless enjoined by this Court.

45. Akamai has had notice of the '426 Patent at least as of the date of this Complaint.

## COUNT TWO
### Infringement of the '195 Patent

46. Plaintiff repeats and incorporates by reference each preceding paragraph as if fully set forth herein and further states:

47. On August 23, 2016, the United States Patent and Trademark Office duly and legally issued the '195 Patent entitled "System and Method for Distribution of Data Packets Utilizing An Intelligent Distribution Network." A true and correct copy of the '195 Patent is attached as Exhibit B to this Complaint.

48. MediaPointe owns all rights, title, and interest in and to the '195 Patent, including the right to assert all causes of action under the '195 Patent and the right to any remedies for the infringement of the '195 Patent.

49. The '195 Patent generally relates to technology that efficiently distributes streamed media content to diversely located client locations via an intelligent distribution network (IDN). The claims of the '195 Patent, including claim 1, recite novel and inventive systems and methods for the distribution of data.

50. For example, claim 1 of the '195 Patent recites:

1. A method comprising:

receiving an initial request for media content from a first client, the request being received by a management center;

directing the first client to a node that is selected to relay a content stream from a content provider to the first client by using a mapping engine that maps trace routes between the management center, the node, and the first client, the first client being directed to the node by the management center;

relaying the content stream from the content provider to the first client via the selected node;

replicating the content stream for other clients during the relaying of the content stream at the selected node, in response to subsequent requests for the media content from the other clients, the other clients connected to the selected node based on an identification that the selected node is already relaying the content stream from the content provider to the first client; and

transmitting the replicated content stream from the selected node to at least one other client in response to the subsequent requests for the media content.

51. Akamai has directly infringed and continues to directly infringe, literally and/or under the doctrine of equivalents, one or more claims, including at least claim 1, of the '195 Patent in violation of 35 U.S.C. § 271(a). For example, Akamai has, without authorization, operated, used, and sold, and continues to operate, use, and sell, access to its CDN that includes the Akamai Servers ("'195 Accused Instrumentalities"), which are capable of operating in the manner described in the claims of the '195 Patent, thereby infringing at least claim 1 of the '195 Patent. Akamai's infringing use of the '195 Accused Instrumentalities includes its internal use and testing of the '195 Accused Instrumentalities.

52. The '195 Accused Instrumentalities satisfy all claim limitations of one or more of the claims of the '195 Patent, including at least claim 1.

53. By way of a non-limiting example, the '195 Accused Instrumentalities include a system that receives an initial request for media content from a first client, where the request is

received by a management center. The management center directs the first client to one of a plurality of nodes (for example, Akamai's more than 233,000 servers) that are configured to relay a content stream from a content provider to the first client.

54. Further, the '195 Accused Instrumentalities include a management center that is capable of or configured to map trace routes between the management center, the node, and the first client to determine the optimal routing with which to deliver the content and relay the data to the client through the optimal IDN node and route. The '195 Accused Instrumentalities includes the ability of the user to choose amongst four different routing methods. These include methods based on latency times as well as user configurable methods. The available routing methods can be used by the management center to direct the first client to the node.

55. Further, the '195 Accused Instrumentalities are capable of and/or configured to relay the content stream from the content provider to the first client via the selected node. The '195 Accused Instrumentalities nodes (also referred to as Points of Presence (POP)) are capable of requesting the content stream from the origin server, which then relays the content stream to the first client.

56. Further, during the relaying of the content stream, the POP of the '195 Accused Instrumentalities is configured to replicate the content stream in response to subsequent requests for the media content. The POP is further configured to transmit the replicated content stream to at least one other client.

57. Since having notice of the '195 Patent, Akamai has indirectly infringed and continues to indirectly infringe the '195 Patent in violation of 35 U.S.C. § 271(b) by taking active steps to encourage and facilitate direct infringement by others, including OEMs, agent-subsidiaries, affiliates, partners, service providers, manufacturers, importers, resellers, customers,

and/or end users, in this district and elsewhere in the United States, through the dissemination and maintenance of the Accused Instrumentalities and the creation and dissemination of promotional and marketing materials, supporting materials, instructions, product manuals, and/or technical information relating to such products with knowledge and the specific intent that its efforts will result in the direct infringement of the '195 Patent.

58. For example, Akamai took active steps to encourage end users to utilize its CDN in the United States in a manner it knows will directly infringe each element of at least claim 1 of the '195 Patent, including by selling access to its CDN and encouraging users to operate devices on that network, despite knowing of the '195 Patent and the fact that such usage of Akamai's CDN will infringe the '195 Patent. The infringing aspects of the '195 Accused Instrumentalities otherwise have no meaningful use, let alone any meaningful non-infringing use.

59. Such active steps include, for example, advertising and marketing Akamai's CDN, marketing and selling of devices capable of or intended for use on Akamai's CDN, publishing manuals and promotional literature describing and instructing users to utilize Akamai's CDN, and offering support and technical assistance to its customers that encourage use of Akamai's CDN in ways that directly infringe at least claim 1 of the '195 Patent.

60. Akamai undertook and continues to undertake the above-identified active steps after receiving notice of the '195 Patent and how those steps induce infringement of the '195 Patent.

61. Akamai's acts of infringement have caused and continue to cause damage to MediaPointe, and MediaPointe is entitled to recover from Akamai the damages it has sustained as a result of those wrongful acts in an amount subject to proof at trial, but in no event less than a reasonable royalty for the use made of the invention in the '195 Patent, together with interest and

costs as fixed by the Court. Akamai's infringement of MediaPointe's rights under the '195 Patent will continue to damage MediaPointe, causing irreparable harm for which there is no adequate remedy at law, unless enjoined by this Court.

62. Akamai has had notice of the '195 Patent at least as of the date of this Complaint

## DEMAND FOR JURY TRIAL

63. MediaPointe hereby demands a jury trial pursuant to Federal Rule of Civil Procedure 38.

## FEES AND COSTS

64. To the extent that Akamai's willful and deliberate infringement or litigation conduct supports a finding that this is an "exceptional case," an award of attorneys' fees and costs to MediaPointe is justified pursuant to 35 U.S.C. § 285.

## PRAYER FOR RELIEF

WHEREFORE, MediaPointe prays for relief against Akamai as follows:

a. Declaring that Akamai has infringed and/or induced the infringement of the Asserted Patents;

b. Awarding MediaPointe damages arising out of this infringement of the Asserted Patents, including enhanced damages pursuant to 35 U.S.C. § 284, and prejudgment and post-judgment interest, in an amount according to proof;

c. Permanently enjoining Akamai, its respective officers, agents, servants, employees, and those acting in privity with it, from further infringement, including inducing infringement and contributory infringement, of the Asserted Patents;

d. Awarding attorneys' fees pursuant to 35 U.S.C. § 285 or as otherwise permitted by law; and

     e.    Awarding to MediaPointe such other costs and further relief as the Court deems just and proper.

Dated: August 16, 2021

Respectfully submitted,

By: /s/ *Kalpana Srinivasan*

Kalpana Srinivasan (California 237460)
SUSMAN GODFREY LLP
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067
Tel: (310) 789-3100
Fax: (310) 789-3150
ksrinivasan@susmangodfrey.com

Meng Xi (California 280099) (WDTX admission pending)
Thomas V. DelRosario (Texas 24110645)
SUSMAN GODFREY LLP
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
Tel: (713) 651-9366
Fax: (713) 654-6666
mxi@susmangodfrey.com
tdelrosario@susmangodfrey.com

**Attorneys for Plaintiff MediaPointe, Inc.**